Mr. Carvin, you may proceed. Thank you, Your Honor. May it please the Court, Michael Carvin for appellants. It's a very straightforward case of statutory construction where the plain language dictates the result. In the only two provisions of the ACA defining the insurance purchases that are subject to the subsidy, it clearly states that it's only when you purchase the insurance off of a quote exchange established by the state under Section 1311. That clearly excludes purchases made off an exchange established by HHS under Section 1321. And yet the government wants you to interpret the phrase to mean precisely the opposite of what its plain language says. No one attempting to convey the thought that a purchase made off either a federal or state exchange would use the phrase that's embodied in the Act, an exchange established by the state. They might have used a phrase like off of an exchange or an exchange established under the Act, which is what you've seen in other parts of the ACA, so they knew how to say it when they intended to do it. So the government really doesn't dispute that. Their argument is this is a very odd place to impose this limitation. They think they've used the phrase hiding an elephant in a mouse hole. But this is exactly where you would expect to see the limitations on what kind of insurance purchases are subject to the subsidies. Because again, these are the only two provisions of the Act which define the purchases that are subject to the subsidies. I think the best illustration of this is that the government agrees that only purchases made off of an exchange are subject to the subsidies. If you bought insurance off of an exchange, you would not be eligible for the subsidies under the Act. Well, the only reason we know that and the only limitation in the Act limiting the subsidies to any exchange is these exact same two provisions under 36B that we're relying on. So for the same reason that we know that you have to make a purchase off an exchange in parallel reasoning, know that it needs to be an exchange established by the state under Section 1311. The other reason we know this is if you look at 2035B, which is right in front of 36B, which is the health care tax credit under the Trade Adjustment Act, they use precisely the same kind of formulation where they say the subsidies in the definition of coverage month will only be available if the state has taken affirmative steps. So the government's basic theory is that when they impose a condition on getting a premium tax credit or some kind of tax break from the IRS or money from the Federal Treasury, that there will be some big neon sign in the Act that says here is a condition that we are now imposing on the states. They've got to establish the exchanges. Well, we know that's not true because the Medicaid provision, which is also in the ACA, doesn't say that you will be eligible up to 133% of the poverty level if and only if the state undertakes the steps to expand its Medicaid coverage. So the so-called famous Medicaid deal, which was at issue in NFIB, was not under some title saying here we are imposing conditions on the state. It was all they did was add an additional eligibility criteria, an additional requirement, and that's precisely parallel to what happens here. All they did was add a certain eligibility criteria. And again, with the exchange, there was no big heading that it had to be under the exchange. There was no legislative history explaining. Under the government's theory, limiting subsidies to exchanges at all doesn't make any sense because Congress wanted to make subsidies as widely available as possible. So why would they limit it to purchases made on an exchange? The obvious answer is because they were trying to induce people, insurers and customers, to get involved in the exchanges. Well, there's no legislative history explaining that truism, but that's the obvious logic of the statute. By parallel reasoning, the reason they limited it to exchanges established by the states was because they wanted to induce the states, which was very important in terms of getting passage in the Senate, to run these exchanges. This was the big debate between the House and the Senate, where Senator Nelson and others were insisting that it be a state-run exchange system, whereas in the House, they wanted a federally-run exchange system. So in order to provide a proper incentive for the states to do it, they said, look, we're going to give you an incentive that, as the district court found, everyone assumed every state would take. All you have to do is run the exchange, and if you run the exchange, then your citizens get billions, hundreds of billions of dollars in free federal money. It's really a better deal than Medicaid because the state doesn't have to lay out a dime. And as the district court correctly and expressly found, everyone assumed that all the states would take the deal. So you get the best of both worlds. You get the subsidies and the state-run exchanges. And in the face of this plain language and this obvious policy benefit, the government really has nothing to offer in contradiction of what we're saying. How is it that they think that the word state in 36B somehow gets transformed into federal under Section 1321? Well, they point you to 1321, and they say by some magic, 1321 turns an HHS exchange into a state exchange. But it doesn't do anything of the sort. All 1321 tells you is when the HHS exchanges will come into existence. It doesn't, quite critically, have any of the language that you see elsewhere in the U.S. Code and you see in the ACA specifically when it responds to territories. When they wanted to say territories should be treated by state, they had a specific provision that says you shall be treated like a state, territorial exchanges. They don't have any language like that under HHS exchanges. So there's literally no basis for treating HHS exchanges like state exchanges. The government says, well, they're doing it on behalf of the state. And that is somehow close enough to be saying that HHS is the state. Well, we know that's wrong. First of all, it can't be on behalf of the state. The only way that HHS can even establish the exchange is if the state has said, no, we don't want it. So they're not doing it on behalf of the state. They're doing it instead of the state, in lieu of the state. They're not acting as the state. And that arises because of something the states did not do under 1311, right? Correct. So therefore, in a sense, it is, the HHS exchange is established because by operation, negative, I guess negatively, under 1311, the states didn't do it. So why is that not still consistent with the language that it is really pursuant to 1311? Well, there's two things. The state has the option under 1311. If they say no, then HHS does it under 1321. And everyone writing the act knew that. And then when they turn to say, when do you get subsidies? They say it's only when the state has exercised the option. When the state has established the exchange under Section 1311. If the state says no, then and only then can HHS establish an exchange. So you've got two kinds of exchanges. The drafters of the act knew it. They referenced that in 36B itself. And then they consciously said, when do you get the subsidies? When the state has exercised its option. And again, that's because that would clearly induce the states to exercise the option. But in terms of the English language, the notion that a provision that is triggered by the state saying no somehow should be treated as if the state had said yes is contrary to the English language and contrary to common sense. They're not acting as the state's agent. The state has decided not to run the exchange. They wanted an exchange. Congress did. They said, OK, HHS will do it. And they're not acting on behalf of the state, even if you look at the language of Section 1321. It says they will establish the exchange within the state. They don't say on behalf of or shall be treated as if the state had done it. They just say, we need an exchange within the state. And finally, we know that when they wanted to equate one exchange with a state exchange, they knew how to do it. And that was the point I just made. When they said, if the territories establish an exchange, such exchange, it shall be treated like the state exchange. They don't have any language like that in 1321. The House version of the bill said, if the states take it over for the federal government, then you shall treat the state as the federal. So all the language, all of the content says, if you're trying to treat something like a state exchange, you say it. You don't do it through this magical language that the government suggests. The other provision, Judge Gregory, that they focus on is it says such. It says such exchange. And they think that that's somehow significant, that the Secretary will establish such exchange. All that tells the Secretary to do is what kind of exchange the Secretary needs to establish. She can't just establish any old exchange. She's got to establish the exchange that's greatly detailed in the act, the one that the state would have established if they had known about it. But again, we know that that doesn't connote that that shall be treated like the state exchange, because again, the territorial provision says such exchange and shall be treated like it. So we know that the word such does not connote that it shall be treated the same. And of course, that's just common sense. Such just tells you what kind of exchange. But the subsidy provision, the availability of subsidies doesn't turn on what kind of exchange it is. It turns on who established it. If the state established it, you get the subsidy. If HHS established it, you don't get the subsidy. And again, that's because Congress understood, if we're going to give these states all of these billions of dollars, regardless of whether or not they establish the exchange, then the states will have no incentive to build the exchanges that we desperately want them to build. Is there a particular reason you didn't bring this as a class action? We didn't think we needed to. It's an APA challenge. And frankly, certifying a class would be very complicated and very atypical under the APA, where you typically have one litigant challenging a regulation. And it's, of course, standard APA law that they shall set aside the regulation. So if the regulation is set aside for my clients, it'll be set aside for all people. And therefore, there won't be any subsidies available. That's, I'm sure, all true, except it seems to me that government could easily, well, maybe not so easily, cure the problem for your four clients pretty easily. No. And the case goes away. No, I don't think. The case absolutely evaporates. If I understand your client's standing, and you'll help me with this, the theory is that they could get a better deal, including they could get away with buying no insurance at all. Right. Or a catastrophic policy if they were not eligible for a subsidy in Virginia. And so it seems to me, I don't know, it seems like it'd be pretty easy for IRS, HHS, Treasury, whoever you're suing here, to sit down and say, well, you know what? These four people who object so strongly and are concerned about having to pay money that they wouldn't otherwise have to pay, we can fix this for them. It seems like it'd be pretty easy to fix this for them. That's not suggesting any responsible public policy official would ever do such a thing. But it does seem that way. Well, I think the responsible public policy official is the relevant point, Your Honor. They cannot behave lawlessly. And if this Court agrees that we have standing, which we clearly do because it inflicts economic injury, the APA instructs that the regulation shall be set aside. It will no longer exist. And once the regulation no longer exists, the IRS rule is- Why couldn't they amend the regulation to say, accept anybody who objects? Because then it's no longer a regulation. Sure, it's a regulation. Oh, but it's not- You didn't bring it as a class action because you know full well that the opt-outs would create traffic problems over Virginia. Nobody wants what you're after here. Since we have standing, you have to proceed to the merits of our claim. And the merits of our claim is that the IRS rule is utterly lawless. It's ultra-virus and must be struck down under the APA. They haven't amended the rule. They haven't said, we're going to create some exceptions for people represented by Mr. Carvin, which would be utterly lawless. They have said, we think this is a proper interpretation of the statute. If you agree with us that the reg is completely contrary to the statute, that makes it a lawless regime. Therefore, there will be no legal basis for them to, at least in the Fourth Circuit, draw funds from the Treasury and provide these subsidies in the states covered by the Fourth Circuit. Because as your court has made clear in the Ithaca College case, an agency must follow this court's interpretation of the Ultra-Virus Act. And indeed, because under the Anti-Deficiency Act, withdrawals from the Treasury are literally illegal if they tried to do what they would be committing a felony once this court has resolved, hopefully, from my perspective, in our favor. So I don't think there is this kind of hybrid argument. And I think that in the short remaining time I have, I don't think the government's argument really has much to do with the statute or what the law was enacted. They want this court to act to second guess the policy judgments of Congress. And their argument is essentially, look, it was very important to have these subsidies. And you should ignore the limitations that Congress put on them, because Congress would have never wanted these limitations. And our point is, we've already explained why Congress very much would have wanted to condition the subsidies on states running the exchanges, because then they get the best of both worlds, state-run exchanges and subsidies. But I think the complete answer to the government's argument is Medicaid. Obviously, Congress wanted Medicaid to continue the most important social welfare program from the 1960s. But they nonetheless said, if the states didn't accept this deal, no Medicaid dollars would flow to any of those citizens. A far more draconian result than the condition they imposed here with respect to the subsidies. But they nonetheless imposed that condition. They did it in language that directly parallels what we're doing here. And there was no legislative history announcing this. And that's because everyone understood, if there's a condition in the statute, that applies. So they're not asking you to interpret what Congress enacted faithfully pursuant to their language. They're asking you to ignore the rule of law and second-guess Congress's policy judgments. And for obvious reasons, we don't think that's a proper role for this court to play. Unless there are further questions, my time is up. Thank you, Mr. Connery. Larry? Good morning, and may it please the Court. Stuart Delery for the defendants from the federal government. I'd like to address both the threshold issues and the merits. And if I might, though, I'd start with where Mr. Carvin ended. Because the government's argument here is based on text and structure of the Affordable Care Act. Plaintiffs put forward a construction of the Act that simply makes no sense. Congress said that if a state does not set up its own exchange, then the Secretary will set up, quote, such exchange within the state instead. But to plaintiffs, Congress's express promise of state flexibility is meaningless, and the resulting federally run exchanges would be useless. The exchanges could not provide the tax credit subsidies that people need to buy insurance, and it would therefore sacrifice the central mechanism of the Affordable Care Act for providing affordable insurance coverage for millions of Americans and would destabilize insurance markets, as has been established in the briefs. Plaintiffs also posit a qualified individual definition that would mean that no one could shop on a federally run exchange. So to plaintiffs, Congress established an alternative, federal exchanges, that would be a charade. But there's more. In 36B itself, Congress set up information reporting requirements for federal exchange tax credits, although plaintiffs say that there would be none. And Medicaid requirements intended to be temporary would remain frozen for states with federal exchanges. Congress supposedly did all of this by operation of subsections buried in a calculation formula and without debate in Congress or in the states that were supposedly on the receiving end of this congressional coercion. So it's inconceivable that Congress set up the system that plaintiffs conjure. Looking at the Affordable Care Act's text and structure as a whole, as this Court must, there's no doubt that federal tax credits are available to lower the cost of insurance on federally run exchanges. Plaintiffs' fundamental error is to focus on particular phrases in isolation. But as the District Court found, when the statutory context is taken into account, plaintiffs' position is revealed as implausible. At a minimum, the government certainly thinks that we have the plain meaning of the statute, the most natural reading of the statute, but at a minimum, it's a reasonable interpretation of the statute that's entitled to deference. So to start with the phrase established by the state in the two subsections of the calculation formula, by its terms, when that phrase in 36B is read in context with the Affordable Care Act, the Act treats federally run exchanges under Section 1321 as the same thing as the exchanges established by the state, not the shells that plaintiffs imagine. 36B itself includes a cross-reference. It's exchange established by the state under 1311. So just focusing on that phrase, it can't possibly be the end of the story. Congress sent the reader elsewhere. Section 1311 refers only to exchanges established by a state, and the Act defines any exchange under the Affordable Care Act as an exchange established under 1311. That's an important point. Exchange is a defined term under the statute. So if you look at 1311, it says that each state shall establish an exchange. And Section 1311D1, which is on page 5A of the appendix to the opening brief, says an governmental agency or non-profit entity that is established by a state. Finally, the definition applicable to all of Title I says the term exchange means an American health benefit exchange established under Section 18031, that's 1311, of this title. So 1311 exchanges are, by their terms, established by states. In 1321, then Congress provided an option, said that if a state either elects not to do so, meeting the specified criteria and the time permitted, then the Secretary shall establish such exchange within the state, meaning the same thing, or the thing just mentioned, as we cite in the brief. The only way these definitions work is if such exchange refers to the same entity. The statute is saying that the federal exchange stands in the shoes of, replaces, for purposes of the act, the exchange the state otherwise would have created, which I think even plaintiffs agree. Significantly, the plaintiffs identify, discover really, context in this act when it suits them and not when it doesn't. The plaintiffs agree that states are not required to set up an exchange despite the shall establish language of Section 1311. And the significant point for purposes of this argument is that that same principle, you can only understand the meaning of a particular phrase by looking at the statute as a whole, needs to be applied for all purposes, not just that one. Both the Supreme Court and this Court have made clear that there is no such thing as the plain meaning of an isolated phrase within a statute. Even at Chevron Step 1, the Court must read the whole statute put together and use all the tools of statutory interpretation. As the Court said in Morgan v. Sebelius, we must not be guided by a single sentence or member of a sentence, but instead must look to the provisions of the whole law and to its object and policy. And when you look at the whole statute, even beyond the language that I've just been talking about, it's clear that the statutory text identifies the problem it was intended to solve. The purpose of the Affordable Care Act was to make affordable health care available to all Americans and to lower the cost of that insurance. Specified in the statute itself under Section 18091-2, and the Supreme Court in the NFIB case identified that as the core bedrock goal. The title that these provisions are in of the statute refers to quality affordable health care for all Americans. The name of the Act is the Affordable Care Act, and the subtitle including the credits is called the Affordable Coverage Choices for All Americans. And finally, both House and Senate reports cited in the Joint Appendix at pages 41 and 155 confirm that the tax credits were the key to ensuring affordable coverage. It's simply not plausible that Congress intended these credits to be, federal tax credits, to be available only on some but not all of the exchanges. And it's not plausible that Congress expected only some of these exchanges to be functioning. As detailed, yes. By the way, does the state who establishes an exchange receive any subsidy itself from doing so? Yes, Your Honor, and that's a significant point. The tax credits are not grants or subsidies to the states. Those are subsidies to individuals to allow them to pay for insurance. States do get a couple of types of incentives to operate their own exchanges. The first are grants to assist in setting up the exchanges, and those are reflected in Section 1311A. But the exchanges are also given regulatory authority over certain aspects, for example, of the plans that are offered on the exchanges. And so for states that choose to set up their own exchanges, the state gets that regulatory authority. Where a state either elects to or fails to establish an exchange, the Secretary has those functions. So in addition to money to help set up the exchanges, there are regulatory incentives that would lead a state to perhaps decide that they want to take on that responsibility themselves. The tax credits, and I should say that the grants, for example, are called state assistance in the statute, or assistance to states. Is there a formula for the grants, or how is that? I think that there, I believe that there was a process for allocating the grants. I'm not sure exactly how the calculation was done. But the tax credits appear in a separate section called premium assistance, confirming Congress's intent and disproving the plaintiff's theory that these were block grants to states. They were not. They were intended to make insurance affordable for Americans, which again was the point of the statute. Significantly, this account that plaintiffs identify, which focuses on supposed motivations to coerce states, was not reflected in the legislative history at the time. It wasn't reflected in debates in the states at the time, as you would expect if this were the significant issue that plaintiffs suggest. And these tax credits are fundamentally different than the Medicaid system in a couple of respects to respond to an argument that was made earlier. First of all, in NFIB itself, the 26 plaintiff states said that in contrast to the Medicaid expansion, this system for the state exchanges provided a, quote, real choice. It was a real choice that the Affordable Care Act offers states to create exchanges or to have the federal government do so. That's what the states told the Supreme Court. Are you quoting from their brief? I'm quoting from their brief at pages 50, page 51, I think it is, or 51 and 35. The point appears twice. Second, for Medicaid, the expansion was essentially mandatory for participants in the program. Here, Congress expressly provided an alternative system, which was that the Secretary would operate exchanges where that was not available. And third, Medicaid actually is a grant program for states. The money goes to the states. They run the program, unlike here, as I said. I think significantly on the legislative history point, the Congressional Budget Office, as we cite in the brief and in the joint appendix, said that they were not aware of any discussion at the time in working with all the members that they worked with of exchanges, tax credits being available only on state exchanges as opposed to federal. And a fact sheet in the joint appendix at page 237 from three House committees contemplates that they're available at all for all of them. And finally, on legislative history, I mentioned Senator Nelson, who's been talked about here this morning. The sentence that the plaintiffs quote from Senator Nelson refers to a single national exchange, which is obviously not what Congress enacted. The whole point is that this would be a state by state exchange, regardless of whether the federal government is operating or not. It's an exchange within the state. The language we're talking about was added in the Senate Finance Committee and didn't change over the course of evolution. So there's no evidence at all that the addition of this phrase was a part of a floor deal with Senator Nelson or anybody else. And significantly, I think, to come back to the statutory point where I began, limiting credits to state exchanges creates irreconcilable conflicts or at least interpretive tension that should lead to ambiguity with a host of other provisions in the act. In addition to exchanges failing to work without the tax credits, which is a bedrock principle, I think, as we've established, the exchanges, given that people could purchase insurance no matter how sick they are, the exchange system only works and the insurance market only works if you, in addition to the minimum coverage provision, have the tax subsidies to make the insurance affordable. That's quite clear. And I think even plaintiffs, in their reply brief at page 16, agree with the disastrous consequences that would flow from federal exchanges. But beyond that, if you look at the reporting requirements in Section 36BF3, it's quite clear that Congress expressly contemplated that these reporting requirements, which were for the purpose of reconciling the advance payment of tax credits with the final payment of tax credits, would apply to both federal and state exchanges. It's an express contemplation by Congress that the tax credits would be available on the federal exchanges. It's a point that the plaintiffs just don't grapple with. So in addition to having reporting requirements with nothing to report, the plaintiffs posit a qualified individual definition that doesn't impose any qualifications, and it would mean that the maintenance of effort provisions in the Medicaid system would never end for federal exchanges, which, again, several states have, with federal exchanges, have relied on the end of the Medicaid maintenance of effort requirements to change their Medicaid plans inconsistently with plaintiffs' interpretation. Does the government prefer sort of a plain meaning structure and purpose approach, or does it favor a Chevron deference approach? Do you have a preference? No, Your Honor. I think the logical flow of the Court's analysis needs to start with Chevron step one, as the established framework provides. And I think if you do that, for the reasons that I've said, you reach the conclusion that putting all of the statute together, as the Court must do, it's quite clear that Congress intended the tax credits to be available, as 36BA says, to applicable individuals based on income and without regard to who is operating the exchange. That and the textual analysis that I've talked about should be the starting point. If the Court concludes, however, that there's ambiguity, and I would suggest that it is not possible to rule for the plaintiffs given all of this on Chevron step one. If this is ambiguity, and so you're at Chevron step two, I think the regulation must be upheld as a reasonable interpretation of the statute, given the interlocking provisions, such exchange, the defined term, and clearly the overriding goal of the law, which is to provide affordable health care to all individuals. How much of a role do or should consequences of a decision contrary to the government's position play, if any? I see that my time has expired. May I answer? I think it's significant in interpretation, because if you're trying to examine the bedrock of statutory interpretation, at least to start, is what did Congress intend, and where the results would be a federal exchange system that would be a charade. That's strong evidence that it's not what Congress intended. Also, in interpretation, the Court has said that the Court has an obligation to make the statute, to read it in a way so that it works together, assuming that that can be done. That's also a relevant factor for the reasonableness inquiry under Chevron step two. I think, certainly tethered to the text of the Act, it's significant and something that the Court needs to do. All right. Thank you. Thank you, Your Honor. May it please the Court, Stuart Raphael for the Commonwealth of Virginia. Under the plaintiff's interpretation of the Affordable Care Act, when Virginia elected in 2012 to forego building its own exchange, it deprived a half million Virginians of significant federal subsidies worth approximately $1 billion a year. Virginia was simply not on clear notice of that consequence. We've attached to our amicus brief the official correspondence between the governor of Virginia, Bob McDonnell, and Secretary Sebelius, that reflects Virginia's decision making as it decided to forego building an exchange. There's nothing in the correspondence that remotely suggests awareness of this consequence. In fact, in the final letter from Governor McDonnell, he indicates that Virginia perceived no comparable benefit to having a state exchange, which is highly significant in the Pennhurst analysis. Now, we agree with the federal government that the plain language of the Act did not put Virginia on notice. I'm a relative newcomer to this statutory argument. You all probably are, too. The thing that really struck me when I was digging into it was the such exchange language in Section 1321C1, because the word exchange is capitalized, and that means it's a defined term. And when you look at the defined term in Section 300GG-91D21, which is not in the plaintiff's in the appellant's brief at the end, the defined term is an exchange, is a health benefit exchange established under Section 18031, which is 1311. So the defined terms is such exchange means the exchange is created by the state. Now, to a layperson, that sounds kind of weird, because the feds are setting up the exchange. But as the Sebelius case teaches us, Congress can say what it wants, and as long as it doesn't violate the Constitution, what it says goes. And that's why a tax could be a tax for purposes of the Constitution, but not for purposes of the Tax Injunction Act. So Congress clearly said in Section 1321 that the such exchange created by the feds was the state exchange. And that seems to me the ballgame. That's the answer on the that's why that satisfies the plain language argument. Judge Greger, your decision in Health Keepers, which we cite, discusses all of the rules of construction. You don't focus simply on one single provision. You have to look at the statute as a whole, and we agree with the government as to its reading. But there's a different analysis that I think you bring to bear, because you have to look at this from the state's perspective under Pennhurst. When Virginia was deciding under the Spending Clause statute whether to forego building its own exchange, it had to have had clear notice about the consequence. And it clearly did not. It was not clear in the statutory language. It was certainly not clear in the legislative history. And in May of 2012, the IRS enacted the regulation at issue here, which made it plain that citizens would be able to obtain the tax credit whether it was a federal exchange or not. So when Virginia consciously forewent building its own exchange, it had no clue that this was going to be the consequence. This is really out of left field. But theoretically, at least, could the government, the federal government, pass title to the Virginia exchange like this afternoon? I guess what I'm getting at is, who is the state? What is the government? What is the exchange? What really is the exchange? What does it mean for the state to establish or run the exchange? Would it require anything other than a title document executed by the appropriate federal officials, accepted, delivered and accepted by some state official? I told you it was out of left field. Judge Davis, I think that gets to Mr. Delery's point that one of the things the state gets by actually doing it itself is the ability to impose its own regulatory oversight. So that's one of the upsides for a state to do with the exchange itself. But in Virginia's case, it saw no benefit and a lot of cost and a lot of risk. I mean, look what's happened in Oregon and Maryland. There was a lot of risk to establishing a state-owned exchange. Would Virginia avoid it? That's right. Now, there was no answer to any of our Pennhurst argument or our Tenth Amendment argument in the appellant's reply brief. The only thing I can imagine that they would say is, well, there are two other amicus briefs on the other side by Kansas and Oklahoma, and they're saying, you know, enforce the deal. But what's conspicuously absent from those briefs is any statement about contemporaneous evidence that those states actually considered this at the time they elected to forego building their own exchange. And I would point the Court to the footnote 31 on page 24 of the members of Congress amicus brief. That's document 44-1, which cites the Georgetown study showing that these states didn't act on that basis at the time. So we agree with the government, and I think the Court should affirm the ruling of the District Court. Thank you. Thank you, Mr. Raphael. Mr. Carvin, you have some time reserved. Thank you, Your Honor. I'd like to begin with the colloquy about Virginia. The disastrous consequences we're talking about, that 36 states won't have subsidies, is purely a product, as Mr. Raphael made quite clear, of the IRS's rule. Virginia would have made a different decision if they'd known subsidies were not going to be provided to Virginia citizens when they decided not to establish the exchange. And that's because the IRS said, you get the subsidies regardless of whether you establish the exchange. So you eliminated any incentives. We go from a situation where the District Court found that all 50 states would take the deal because of this subsidy incentive to a situation where 36 states have said no thank you, and two states are about to say no thank you even more. So we've gotten to precisely the situation that Senator Nelson was designed to avoid, which is a federally run health care exchange, which was precisely the opposite intent of conditioning subsidies on states running the exchanges. So the stakes are high. And the stakes are very high. The IRS has hijacked the conditional subsidies that are plainly in the statute and said, you get the money regardless of whether or not you do it. And it's precisely because the stakes are so high and hundreds of billions of dollars are at stake that you don't defer to the agency. As this court made clear, and of course in ink, and as the Supreme Court. I'm sorry, I'm missing something. All right. I'm sorry. I love your passion, but I'm not sure what it's based on. Well, it's the simple proposition. Let's say the city of Richmond said during the winter, we'll give you $100 if you clear the snow in front of your sidewalks. And then a Richmond agency says, you know what? You get the $100 if you don't clear the snow in front of your sidewalk. I think we all know that there's going to be a lot more snow on the sidewalk. And my point is, and what is clear from this was the reason that they said you get the subsidies on the state exchanges was to provide an incentive for the state to set up the exchange. That's what they want. What does that have to do with your clients? What it has to do with is the statutory language. They keep saying it's so illogical that you would limit subsidies. And I agree. It would be illogical to limit subsidies if we were arguing that states east of the Mississippi don't get subsidies. The point I've been trying to convey is it's eminently sensible to condition subsidies. Why is it? Because then you get the best of both worlds. You not only get the subsidies, you get the states to run the exchanges. What does that have to do with your clients? My clients are. What on earth do your clients care about whether the exchange is run by the state or the feds? Because since the IRS rule has changed the plain statutory language, they are now as residents of Virginia being given subsidies, which subject them to the individual mandate. Absent the subsidies, they would be below the 8% of income threshold that says you don't have to buy insurance. That's where they want to be. They don't want to be forced to buy a product that they don't like. But because the IRS has changed the rule and made subsidies available, then HHS will say, and the IRS will say is, you've got under the individual mandate to buy insurance. So if the IRS had adhered to the plain language of the statute, my clients could go on and live their lives the way they want. You want us to adopt an interpretation of this reticulated statute and kick millions of people in five states or four states in this circuit off the insurance rolls so that the four people you represent here don't have to pay a few dollars extra for insurance? No. That's what this case comes down to. Not at all, Your Honor. I must respectfully disagree. What am I missing? We want you to give Virginia the choice that Virginia says it's entitled to. I guarantee you, if the IRS rule isn't struck down and you make it clear that the statute means what it says, that Virginia gets to decide, am I not going to run the exchange and cost my citizens hundreds of billions of dollars in federal subsidies? Of course not. They're going to immediately- So your clients are going to end up paying anyway. Not at all. You see, that's what I'm not getting. If I understand your argument, you're saying the perfect should be the enemy of the good. And if your prediction comes to pass- If my prediction- Your clients are going to end up paying the exact same amount for the exact same insurance coverage or the penalty because your prediction is, I think I heard you say, that Virginia is going to take over the exchange. But the difference is, your honor, that that is left to the democratic choices of Virginia, which is what the federal statute contemplates. It doesn't contemplate a dictate from HHS and IRS that we will ignore the democratic- But we have the Solicitor General here pointing to an agreement, an understanding, an undertaking by the Commonwealth back in 2012 to say, hey, we like this deal. We like this deal. So I'm sorry, I'm missing something here. Of course they like the deal. The deal was the one offered to them to IRS. And again, it was, you want to run the exchange, you get the subsidies. You don't want to run the exchange, you get the subsidies. So if subsidies are driving your decision, then obviously there's no advantage to running the exchange. No one is going to undertake that politically thankless, controversial task. We don't have to speculate about any of this, your honor. The Virginia legislature is going through this with the Medicaid deal right now. Governor McAuliffe wants to expand the Medicaid criteria and the legislature doesn't. But everybody knows what the stakes are. If they decide to change the state's Medicaid criteria, then those people become eligible for the federal subsidies from the Medicaid statute. That is precisely the choice that Congress offered to them under the subsidy deal. And all we are saying is that the state of Virginia, the Commonwealth of Virginia, just like it's deciding whether it ought to take the Medicaid deal, should have the option of taking the subsidy deal. But the deal they should be offered is that which is in the statute, which like the Medicaid deal, conditions the subsidies on the state taking certain action, unlike the deal that they were offered, which says you get the subsidies regardless of whether you take the state actions. And that is what we are trying to accomplish. That is the legal principle here. And that, I think, is what should dictate this Court's result. Thank you. Thank you very much. Just one question, just to make sure. Are you saying, or do you say, that if the states ran their program? I understand your argument that, okay, if they had not been enticed by what you contend is an improper IRS regulatory decision to grant the credit. If they had not been enticed by that, then clearly the states would say, wait, I better run it because if I don't run it, my citizens won't get the credit. I understand that. But can you explain to me, is it, how is it more likely that your clients would be able to not have insurance or only get catastrophic insurance without a penalty? Okay. In terms of the simple result, in terms of their income, absent the subsidies, they would have to pay more than 8% for the second least expensive bronze plan on the exchange. None of this is disputed. All of this is in the Mould's declaration at Joint Appendix 32 and 34. And he walks you through this. This is their employee that walks you through this. But because now they're eligible for subsidies, then they now are not subject to the hardship exemption. So they have to go out and buy insurance. So for Ms. Levy, for example, she has to spend $1,800 out of her own pocket now to buy insurance. She gets some of it from the subsidies, but not all of it. So she's got to, part of the insurance is paid for by the subsidies. Part of it is paid for out of her own pocket. Same situation with Mr. Hurst. Because the subsidies put them above the exemption threshold, they are now obliged to buy insurance. And $0.10 of that, all of that will not be paid by the subsidies. Some of it will have to be paid by themselves. So absent the IRS rule, they would be free not to buy insurance. And now because of the IRS rule, unlawfully making the subsidies available to them, the And therefore, they suffer classic pocketbook injury. Oh, yeah, yeah. I understand that. Oh, okay. You made that clear. But I'm talking about the idea that now the state did what you said they would have done had they known that the state set up its own exchange and put also its own regulatory regime on it. Again, that is in response to the notion that limiting, conditioning the subsidies on states establishing the exchanges makes no sense. And I'm saying it makes perfect sense. It provides the states with the same incentives to establish an exchange as it did under the Medicaid deal to expand Medicaid. Now, I'm not making any political predictions about how that debate is going to work itself out. We know, for example, that right now the state is at loggerheads about the Medicaid deal. The same thing may or may not prove worth of the subsidies. What I am saying is that if they keep coming up here and saying all these millions of people will be deprived of subsidies if our provision prevails. And my point is that's because the IRS rule got us in that shape. There's no reason to think we would have been in that shape had Virginia been offered the deal that the statute offers as opposed to the non-deal, the non-incentive deal offered by IRS. And I can't tell you how the Virginia legislature or how Governor McAuliffe. Does your hypothetical turn in any way on the way the Supreme Court ruled on the Medicaid expansion? Because it's clearly distinguishable. It's clearly distinguishable. The states were going to lose an awful lot under the original formulation of that Medicaid plan. It is distinguishable. But that's not true about the tax subsidy. Not remotely true. I fully agree with you, which is why. I don't understand why you rely so heavily on Medicaid when that's a different animal altogether. It would have been much more risky. It was way more risky for Congress to condition Medicaid subsidies on the states taking the deal. Because as you point out, those subsidies are well in excess of anything that these premium tax credits involve. You would have literally taken off the rolls the poorest of the poor who have been there since 1965. So the notion that the government comes up here and says it's unthinkable that Congress would have run the risk that one state would say no is put to the lie by the fact that they took the risk with Medicaid, which has far more importance to American society and is far more important to people's health care. So obviously they would have run the tiny little risk that they would turn down the premium tax credits, plus which, as Mr. Delery himself made clear, they weren't giving up everything. In Medicaid, it was a baseball arbitration, all or nothing. States turned it down. No Medicaid dollars. Here, at least you had the fallback, as they noticed in NFIB, of you'd have an exchange. You'd have an exchange that has all these virtues of Amazon, et cetera. You just wouldn't have the subsidies. So whereas in Medicaid, Congress was putting all of its chips on black and praying that the states didn't say no, because if they had said no, it would have been draconian consequences. Here they were running a very small risk, and they had every reason to expect the states to do it. Because under the Medicaid deal, the states would have had to spend $60 billion of their own dollars by 2021. Here, as Mr. Delery confirmed, not a dime. So this was a much easier deal for the states to take, and it was much less of a gamble for Congress to risk than it was in Medicaid. All right. Thank you, sir. Thank you. We're going to come down to Greek Council, and then
judges: Roger L. Gregory, Stephanie D. Thacker, Andre M. Davis